Charles F. Dieterich, Appellant, *v.* James C. Fargo, as President of the American Express Company, Respondent.

Injunction — provisions of Forest, Fish and Game Law relating to the transportation of deer and venison in open season do not apply to domesticated deer and venison thereof.

In an equity suit for injunctive relief the rights of the plaintiff, where they depend upon a statute, are to be determined with reference to the statute in force at the time when the relief, if any, is to be awarded.

The title of the Forest, Fish and Game Law indicates that its purpose, so far as animals are concerned, was to protect the wild animals of the state.

The word "game" in its ordinary signification does not include domesticated animals. Throughout the statute, so far as it relates to game, wild animals only are meant unless the context indicates a contrary intention.

The statute is highly penal in its character, making every violation thereof a misdemeanor and, therefore, it should not be construed so as to embrace cases which do not clearly fall within its terms.

Under the provisions of sections 2, 4 and 8 of the Forest, Fish and Game Law in force in October, 1906 (L. 1900, ch. 20, amd. L. 1906 ch. 478), and sections 76, 77 and 78 of the present law (L. 1908, ch. 130) domesticated deer may lawfully be killed and the venison thereof may lawfully be accepted for transportation by an express company in this state without restriction as to number, provided this is done only in the open season.
*Dieterich* v. *Fargo*, 119 App. Div. 315, reversed.

(Argued December 7, 1908; decided February 23, 1909.)

APPEAL from a judgment, entered October 9, 1907, upon an order of the Appellate Division of the Supreme Court in the first judicial department, which affirmed an interlocutory judgment of Special Term sustaining a demurrer to the complaint.

The nature of the action and the facts, so far as material, are stated in the opinion.

*John A. Garver* for appellant. The statute, as construed by the lower courts, is in derogation of common-law rights. (2 Black. Comm. 391–393; 2 Am. & Eng. Ency. of Law, 342; *Goff* v. *Kilts*, 15 Wend. 550; *Blades* v. *Higgs*, 11 H. L. Cas. 621; *James* v. *Wood*, 8 L. R. A. 448; *Ulery* v. *Jones*, 81 Ill. 403; *Bartlett* v. *Budd*, 1 Low. 223; *State* v. *House*, 65 N. C. 315; *State* v. *Shaw*, 67 Ohio St. 157.) The statute would be unconstitutional if made applicable to domestic animals in Dutchess county. (*Phelps* v. *Racey*, 60 N. Y. 10, 14; *People* v. *Bootman*, 180 N. Y. 1; *Geer* v. *Connecticut*, 161 U. S. 519; *Lawton* v. *Steele*, 152 U. S. 133, 137; *Dobbins* v. *Los Angeles*, 195 U. S. 223, 239; *Litchfield* v. *Pond*, 186 N. Y. 66; *Wright* v. *Hart*, 182 N. Y. 330; *Schnaier* v. *Navarre Hotel Co.*, 182 N. Y. 83; *Lochner* v. *New York*, 198 U. S. 45.) The statute as applied to domestic deer in Dutchess county is void. (*People* v. *Hesterberg*, 184 N. Y. 126; *Wright* v. *Hart*, 82 N. Y. 330.)

*John K. Ward* for respondent. The section of the Game Law in question prohibits shipment of deer or venison whether wild or raised in the manner set forth in the complaint and is constitutional. (*People* v. *Booth,* 105 App. Div. 184; 31 U. S. Stat. at Large, 1887; *Phelps* v. *Racey,* 60 N. Y. 10; *People* v. *Bootman,* 180 N. Y. 1; *Comrs.* v. *Gilbert,* 160 Mass. 157; *Roth* v. *State,* 7 Ohio C. C. 62; *Lawton* v. *Steele,* 152 U. S. 133; 119 N. Y. 226; *Organ* v. *State,* 56 Ark. 270; *McReady* v. *Virginia,* 94. U. S. 39; *State* v. *Beal,* 75 Me. 289; *Gentile* v. *State,* 29 Va. 409.)

WILLARD BARTLETT, J. Mr. Charles F. Dieterich, the plaintiff in this action, owns and maintains a private deer park at Millbrook in Dutchess county, about 2,400 acres in extent, completely surrounded by a strong steel wire fence eight or nine feet in height. In this park he keeps 200 deer " The deer contained in the said park are domestic animals consisting of a few domesticated deer purchased by the plaintiff outside of the state of New York at the time when the said park was created, but almost entirely of deer bred in confinement in the said park since that time." These deer breed very rapidly and unless a considerable number of the bucks are killed every year there would be continued warfare among them. The only available market for the venison produced by these deer is in the city of New York. The American Express Company is the only express company engaged in the transportation of property between Millbrook and that city and thus affords Mr. Dieterich the only means for transporting such venison to market. In September, 1904, a controversy arose between him and the American Express Company and the forest, fish and game commissioner respecting the duty of the express company to transport venison of the plaintiff's domesticated deer from Millbrook to New York. As the result of the controversy the commissioner rendered a decision in which he advised the American Express Company as follows :

" While the law (the Forest, Fish and Game Law) would apply to venison, possibly there might be a question about

venison from deer bred in confinement. We are satisfied it was not the intent of the law and that you are perfectly safe in transporting venison to New York if plainly marked."

Two years later, in October, 1906, a similar controversy again arose and the present forest, fish and game commissioner determined that in the absence of a judicial decision he would have to assume that the Forest, Fish and Game Law applied to domesticated deer. Mr. Dieterich subsequently in the same month presented to the American Express Company at Millbrook for transportation to New York city several carcasses of his domestic deer and venison plainly marked as deer raised in confinement and killed in his park and tendered the regular express charges and requested the express company to receive and transport the same, but this the express company declined to do on the ground that by complying with the request it might violate the provisions of the Forest, Fish and Game Law.

Upon this refusal Mr. Dieterich commenced the present action against Mr. James C. Fargo, as president of the American Express Company, setting forth in his complaint the facts above stated and praying for a judgment enjoining the American Express Company "from refusing to receive any and all venison or deer killed in the said inclosed deer park and to transport the same from Millbrook to the City of New York or elsewhere upon payment of the regular express charges thereon, and provided that each consignment offered for shipment be plainly marked as deer or venison raised in confinement and killed in the said park."

The defendant demurred to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was sustained. From the interlocutory judgment sustaining the demurrer the plaintiff appealed to the Appellate Division where the said judgment was affirmed. A final judgment was thereupon entered sustaining the demurrer and dismissing the complaint, from which final judgment the plaintiff has appealed directly to this court as permitted by section 1336 of the Code of Civil Procedure.

The provisions of the Forest, Fish and Game Law which are material to be considered in this controversy were contained in sections 2, 4 and 8 of the statute as in force in October, 1906, at the time when the plaintiff presented his venison to the defendant for transportation. (Laws of 1900, chap. 20; Laws of 1906; chap. 478.) The corresponding provisions now in force are to be found in sections 76, 77 and 78 of the present Forest, Fish and Game Law (Laws of 1908, chap. 130). It is the effect of the latter provisions which we are called upon to consider, inasmuch as in an equity suit for injunctive relief the rights of the plaintiff where they depend upon a statute are to be determined with reference to the statute in force at the time when the relief, if any, is to be awarded. There is no substantial difference, however, between the Forest, Fish and Game Law as it existed in 1906 and the Forest, Fish and Game Law as it exists now in regard to the transportation of deer and venison. That subject was dealt with in section 8 of the former act and is dealt with in section 78 of the present act. These sections are identical in substance except in the third sentence. The phraseology of that sentence in the former act was as follows:

" Deer or venison killed in this state shall not be accepted by a common carrier for transportation from November nineteenth to September thirtieth, both inclusive, but if possession is obtained for transportation after September thirtieth and before midnight of November eighteenth, it may when accompanied by the owner lawfully remain in the possession of such common carrier the additional time necessary to deliver the same to its destination." In section 78 of the present act the third sentence has been changed so as to read thus:

" Deer or venison killed in this state may be accepted by a common carrier for transportation from September sixteenth to November first, both inclusive, but if possession is obtained for transportation after September fifteenth and before midnight of November first, it may when accompanied by the owner lawfully remain in the possession of such common carrier the additional time necessary to deliver the same to its

destination." The difference between these two provisions is that the former was prohibitory and the latter is permissive. The prohibition has been transferred to section 76 of the present statute, which provides that deer shall not be taken at any other time or possessed except as provided by sections 77 and 78. The other changes in the law are immaterial to this litigation.

In my opinion, the forest, fish and game commissioner was right in deciding, as he did in 1904, that the statute does not apply to the transportation during the open season of venison obtained from domesticated deer bred in confinement. From early times the law of England has made a distinction between wild deer and tamed deer. "Deer, though strictly speaking *feræ naturæ,* if reclaimed and kept in inclosed ground, are the subject of property, pass to the executors and are liable to be taken in distress." (1 Halsbury's Laws of England, § 79̇9.) In the case of *Morgan* v. *Earl of Abergavenny* (8 Common Bench, 768) there were upwards of 600 deer kept in a park of 900 acres; they were attended by keepers, who fed them regularly with hay, beans and other food; the does were watched at falling time and the fawns taken as soon as dropped and marked; some of the animals were selected from the herd from time to time and stalled and fattened for venison. It was held that upon these facts a jury was warranted in finding that the deer had been tamed and reclaimed. They had, therefore, ceased to be wild animals and as such a part of the inheritance but constituted personal property which passed to the executor. The same doctrine was asserted by Sir W. PAGE WOOD when vice-chancellor, in the case of *Ford* v. *Tynte* (2 Johnson & Hemming, 150) where it appeared that the deer were also kept in a park in which they were caught with the assistance of muzzled dogs and then turned into an inclosure or into pens to fatten, after which they were shot for the market and the venison sold for profit like mutton and beef. In the present case there is no doubt that the deer of the plaintiff were as fully reclaimed as the animals mentioned in these English decisions; for the allegation of the plaintiff is that they are domestic animals and that the herd

consists almost entirely of deer bred in confinement. This
allegation is admitted by the demurrer and must of course be
taken as true for the purposes of our decision.

The title of the Forest, Fish and Game Law indicates that
its purpose so far as animals are concerned was to protect the
wild animals of the state. It is " An act for the protection
of the forests, fish and game of the state." The word " game "
in its ordinary signification does not include domesticated
animals. When, therefore, in the Forest, Fish and Game
Law we find prohibitions against the killing at certain seasons
of geese, ducks and swans no one would suppose for an
instant that reference was made to domestic geese, ducks or
swans; and throughout the whole statute so far as it relates
to game it is obvious that wild animals only are meant unless
the context plainly indicates a contrary intention.

The sections of the statute relating to deer which we are
called upon to construe in this case deal with two subjects ; the
killing of deer and the transportation of venison. Section 7
thus prescribes the open season for deer and provides that
deer shall not be taken at any other time. I think that this
prohibition may fairly be held to comprehend all deer, whether
wild or domesticated. While the purpose of the legislature
by this enactment doubtless was to prevent the killing of wild
deer except in the open season, it possessed the constitutional
power to prohibit the killing of any deer during the closed
season in order to prevent an evasion of the principal prohibi-
tion. That the power of the legislature goes to this extent
cannot be questioned since the decision of the Supreme Court
of the United States affirming the judgment of this court in
*People ex rel. Silz* v. *Hesterberg* (184 N. Y. 126 ; 211 U. S. 31).
When we come, however, to the provision that no person shall
take more than two deer in the open season and to the provi-
sions relating to the transportation of venison, it seems to me
that a different intention is disclosed, and that those parts of the
statute apply only to wild deer. The statute is highly penal
in its character, making every violation thereof a misdemeanor
and, therefore, it should not be construed so as to embrace

cases which do not clearly fall within its terms. Where, as in the case at bar, the venison is plainly marked and readily identifiable as having been obtained from domesticated deer, it is difficult to perceive any good reason for prohibiting its sale during the open season, and I do not think that we ought to read such a prohibition into the Forest, Fish and Game Law by judicial construction. If the legislature shall consider further safeguards necessary in order to prevent an evasion of the provisions relating to wild deer, it may readily provide for a system of inspection and certification by the game wardens or otherwise before the venison of domesticated deer is allowed to be received for transportation. The keepers of domesticated deer might be required to register as such with the forest, fish and game commissioner before their venison was thus receivable. It must not be inferred from anything which has been said that the owner of lands frequented by wild deer can render them domesticated simply by inclosing their domain with a fence and denominating it a deer park. The domestic character of the plaintiff's deer is unquestioned; and it is only deer which are strictly of that nature that are to be deemed outside the statutory provisions relating to the transportation of game in the open season. As the law now stands, however, I think that domesticated deer may lawfully be killed and the venison thereof may lawfully be accepted for transportation by an express company in this state without restriction as to number, provided this is done only in the open season. As I have already intimated, I think that the forest, fish and game commissioner originally construed the law correctly in this respect, and that it is the duty of that officer to adhere to the construction then adopted, unless the legislature shall see fit to impose some further restrictions such as have been suggested applicable to domesticated deer only.

I advise that the judgment appealed from be reversed, the demurrer overruled, with costs in all courts, and the defendant be permitted to answer within twenty days, upon payment of costs.

VANN, J. (dissenting). The legislature well knew when it passed the Forest, Fish and Game Law that the pothunter and the marketman are the greatest obstacles in the way of protecting the deer of the state from destruction. Without a market the pothunter has no inducement to violate the law, and without resort to the usual agencies of transportation the marketman cannot violate the law. The market for deer was the evil aimed at by the legislature when it forbade the transportation of venison by any common carrier. A single carcass, when accompanied by the owner, was excepted from the prohibition in the interest of those who hunt for sport and not for the market. The statute should be construed in the light of the evil it sought to remedy, and when it says that deer shall not be transported, making no exception of tame deer, I think it means all deer. The presumption is that if the legislature had intended to except tame deer it would have said so and would have surrounded the exception with proper safeguards to prevent evasion, as it did when permitting the shipment of a single carcass. The courts have no right to read an exception into the statute when the legislature left it out. If one man in the entire state wishes to establish a peculiar industry that needs special legislation, he should not call upon the courts for it.

While tame ducks and geese can be distinguished from the wild, nature has placed no distinguishing marks upon deer so that one kind can be told from the other. The furtive ingenuity of pothunters and marketmen would laugh at the suggestion that tame deer should be plainly marked when presented for transportation, for what is there to prevent them from marking wild deer in the same way? Hereafter, when the carcass of a deer labelled, "This is a tame deer from a private park," is presented to the defendant to be transported to market its agent will be obliged to accept it, and thus the barrier erected by the legislature against evasion of the law will be broken down.

The power of the legislature to prohibit the transportation or sale within the state of fish or game captured without is

not open to question since the decision of the Supreme Court of the United States, affirming our own, in *People ex rel. Silz* v. *Hesterberg* (184 N. Y. 126; 211 U. S. 31). If the legisla- ture by the use of general terms intended to prohibit the sale here of birds of a kind that never grew here, as held in that case, how can we say in this case that it did not intend to include all deer in its prohibition against the transportation of deer when it made no exception of tame deer, and the evil aimed at was the exposure of deer for sale in the market? If, as it is conceded, the legislature in forbidding the killing of deer during the close season without limiting the prohi- bition to wild deer meant to include all deer, why did it not have the same intention when it used similar language in deal- ing with the transportation of deer? The wishes of a few should not prevail against the interests of the many, which the legislature intended to protect, and I vote to affirm the judgment appealed from upon the prevailing opinion below. (119 App. Div. 315.)

CULLEN, Ch. J., GRAY, EDWARD T. BARTLETT, WERNER and HISCOCK, JJ., concur with WILLARD BARTLETT, J.; VANN, J., reads dissenting opinion.

Judgment reversed, etc.